

Marc J. Randazza, NV Bar # 12265
Ronald D. Green, NV Bar # 7360
J. Malcolm DeVoy, NV Bar #11950
Randazza Legal Group
6525 W. Warm Springs Rd., Ste. 100
Las Vegas, NV 89118
888-667-1113
305-437-7662 (fax)
rlgall@randazza.com

Attorneys for Plaintiff,
Liberty Media Holdings, LLC

**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

Liberty Media Holdings, LLC, a California Corporation

Plaintiff,

vs.

FF Magnat Limited d/b/a Oron.com; Maxim Bochenko a/k/a Roman Romanov; and John Does 1-500,

Defendants.

Case No.: 2:12-cv-01057

**PLAINTIFF'S REPLY TO DEFENDANT FF MAGNAT LIMITED'S OPPOSITION TO MOTION TO ENFORCE SETTLEMENT AGREEMENT**

The Plaintiff, again, declines to address each and every impertinent and *ad hominem* attack and factual misrepresentation in the Opposition.[1] ECF 44. The Plaintiff will limit the factual refutations contained herein to the issues that seem to be relevant to the dispute. Removing the table pounding, the instant motion boils down to this: There was a written offer to settle, made in writing. That offer was accepted. The Plaintiff performed, at least in part. The case is over.

[1] Plaintiff counsel declines the invitation to turn this litigation into a series of unfounded personal attacks. However, the Plaintiff (and its counsel) will address any of the irrelevant issues raised therein upon inquiry from the Court, should the Court find itself interested.

The Defendant tries to manufacture an illogical dispute out of thin air – using transparent misrepresentations to do so. The fact is that the case is settled and the Court should enforce the settlement agreement.

## I. INTRODUCTION

On July 1, 2012, counsel for the Defendant FF Magnat d/b/a Oron.com (hereinafter "Oron") sent counsel for the Plaintiff a letter, which recited (in detail) terms of a settlement agreement. The Plaintiff Liberty Media Holdings, LLC (hereinafter "Liberty"), agreed to the terms and authorized its counsel to sign on its behalf, which he did, and then delivered the signed agreement back to Defendant's counsel. The terms are in writing (drafted by the defense, no less). The Parties agreed to the terms.

After the execution of the settlement, and after the Plaintiff began performance, the Defendant manufactured a spurious disagreement regarding the interpretation of one portion of the terms, namely whether the agreement released a party who was not part of the settlement discussions, and who swore under penalty of perjury that he had no connection to the Defendant. The Plaintiff found defense counsel's interpretation to be illogical and a transparent attempt to prolong the dispute. But, rather than continue arguing with defense counsel about the interpretation, Plaintiff agreed to concede to Oron's position. Therefore, even if there was ever a reasonable dispute over the terms, the Plaintiff conceded the point before filing this motion. Nevertheless, the Defendant sees fit to cause the Plaintiff to incur additional fees and to waste judicial resources.

## II. FACTUAL ISSUES

The Defendant seems eager to avoid the settlement agreement now that the Defendant received a valuable benefit thereunder. Why is anyone's guess, but the desperation is clear in the thin factual misrepresentations relied upon.

### A. The "Put the Brakes on" Email is not What Defendant Says it is, and Would not Matter if it was.

Defendant points to an email from July 3, 2012 as Plaintiff taking "the position that the parties 'need to put the brakes on' the settlement discussions." ECF 44 at 5. Defendant

transparently misrepresents this communication. First of all, the Defendant falsely claims that this email was sent to defense counsel as a message from Plaintiff to Defendant that it repudiated the settlement. Even a perfunctory review of the email, in context, reveals that the email is not at all what Defendant's counsel claims it is. If the Court reviews the whole email chain, it can be seen that this email is a reply from Plaintiff's counsel to an email from Plaintiff's in-house paralegal and instructs her, not anyone else. Defendant also fails to note that the email was not in reference to settlement, but in reference to a Draft Consent Summons that had been prepared for submission to the Hong Kong court. A complete copy of the entire email chain, along with the attachment to the original email is attached as Exhibit 1. If the Court reviews the email chain in its entirety, it is abundantly clear who is involved in the conversation, what it pertains to, and that no reasonable person could interpret it as anything that the Defendant claims it stands for.

Furthermore, even if it happened to be what the Defendant says it is, its language is hardly an effective repudiation of a settlement agreement. The very language used would be far from effective. If the Defendant had filed this motion, instead of the Plaintiff, the Plaintiff would expect to be laughed out of Court if it pointed to this email to signify that the settlement agreement was no longer valid. No matter what it said, when it was from, or whom it was to, at the time when it was sent, the Parties were already bound by the settlement agreement.

**B. The Attempts to Meet and Confer**

In Plaintiff's Motion to Enforce Settlement, Liberty's counsel states that they attempted to meet and confer with defense counsel "from 3:00 PM on July 5, 2012 until 11:05 AM on July 6, 2012." ECF 33. In the declaration filed with the Opposition, Mr. Lieberman asserts that Plaintiff identified "several purported phone calls it made to me on the morning of July 5th" and goes on to reference power outages in Washington D.C. ECF 44-1. Mr. Lieberman also states that he was "largely without phone service through the end of the day on Thursday, July 5th." *Id.*

Mr. Lieberman fails to acknowledge that in addition to attempting to contact him multiple times after 3:00 PM on July 5, 2012, Plaintiff attempted to contact him multiple times on the morning of July 6th. Plaintiff telephoned Mr. Lieberman's office at 10:59 AM PST, where a receptionist answered the phone. Exhibit 2, Declaration of Erika Dillon ¶ 2-3. Clearly, at this

point, the telephone systems in Mr. Lieberman's office were functional. Despite the fact that Mr. Lieberman was in his office, the receptionist could not get Mr. Lieberman on the line and could provide no reason as to why. In fact, he expressed surprise – an emotion shared by the Plaintiff. Dillon Dec. ¶ 4. Mr. Lieberman's telephone system was clearly working the morning of July 6, 2012, and he failed to respond to any of these attempts at communication. It insults this Court's intelligence to expect it to believe that Mr. Lieberman was deprived of all forms of modern communication.[2] Why Mr. Lieberman chose to cut off all contact is unclear, but what is clear is that there was no collapse of the communication infrastructure. Furthermore, not only was Mr. Lieberman unavailable during this time period, but Mr. Kahn was inexplicably unreachable as well. Plaintiff made multiple attempts to meet and confer prior to the filing of the motions on July 6, 2012, and neither defense counsel elected to accept overtures to communicate. Presumably, Mr. Kahn was not also affected by the same misfortune that Mr. Lieberman claims befell him.[3]

**C. The Child Pornography Accusation was Well-Founded**

Finally, Defendant objects Plaintiff's statement that Oron "with its promises of anonymity for its users, is a repository for child pornography, as well as infringing content." ECF 17 at 4. While this is not directly relevant to the instant motion, the Defendant claims that there was no support for the accusation. ECF 44 at 3. Lest the Court believe that none exists, and this information was invented without evidentiary support, the Plaintiff must respond: Plaintiff interviewed Sybrand R. Kuppens, an online investigator involved in locating and stopping the distribution of child pornography and piracy on the internet. Mr. Kuppens identified child pornography distributed through Oron.[4] See Declaration of Sybrand R. Kuppens, generally;

---

[2] If the Court would like to explore this issue, an Order to Show Cause requiring Lieberman to disclose phone and email records from that period of time would likely reveal facts which would assist the Court in evaluating any credibility issues.

[3] While it is mere speculation, Plaintiff counsel suspects that someone on the Defendant's team prefers lengthy litigation to a settlement. The Defendant's team seemed to be caught quite off guard when Plaintiff conceded to their interpretation.

[4] Since "offers to provide or requests to obtain child pornography are categorically excluded from the First Amendment," the actual web addresses in these screen shots are blurred out. *U.S. v. Williams*, 128 S. Ct. 1830, 1839 (2008). However, Oron can certainly confirm that the links are valid.

Kuppens Exhibit A. Furthermore, other independent investigators are prepared to support Mr. Kuppens' findings. See also Declaration of Eric Green and Green Exhibits A-B; Declaration of Nathan Glass and Glass Exhibits A-D.

Nevertheless, factual sideshows aside, the true issue here is "is there a settlement?" The answer is yes.

## III. ARGUMENT

### A. There Was "Mutual Assent" as to the Material Terms of the Settlement

The Defendant claims that there is a dispute over the settlement terms, thus rendering it invalid. The crux of the manufactured dispute is whether Mr. Bochenko, a Defendant who took no part in the settlement negotiations, who did not sign off on the settlement agreement, and who swore under oath that he was an innocent victim of mistaken identity, also benefits from its terms. ECF 21-1. In the Opposition, Oron states that its counsel "understood that he was negotiating a global settlement of the litigation in the United States and in Hong Kong." ECF 44 at 6. This seems to contradict provisions of the settlement,[5] but the Plaintiff has conceded to the Defendant's "understanding." The Plaintiff believes that such an interpretation of the agreement is strange given the facts. Even if the Plaintiff had refused to concede this point, the Plaintiff believes that the Court should then enforce the settlement to exclude Mr. Bochenko. Nevertheless, the Plaintiff capitulated to this interpretation. See ECF 41-2 at Exhibit B-3. And thus the Defendants clearly got what its attorney now says, *post hoc*, he "understood" the agreement he drafted to mean.

Again, this (like much raised by the Defendant) is an unnecessary side-show. The Plaintiffs counsel met and conferred with defense counsel David Kahn on July 3, 2012 about this issue. During that call, Randazza stated to Kahn that Liberty would defer to Kahn's interpretation of the agreement. Declaration of Marc J. Randazza ("Randazza Dec.") ¶ 2-3. Randazza expressed to Kahn that it might seem unorthodox to do so, but that Randazza trusted Kahn's professionalism and

[5] ECF 44-2; This paragraph states that Oron will provide to Liberty the identifying information it would need to pursue the individuals that uploaded Liberty's works to Oron. As stated in the Complaint, Liberty intended to pursue these individuals from the beginning of the suit and listed them under "John Does 1-500" and stated its intention to amend the Complaint as their identities became known. ECF 1 at ¶ 17-18.

desire to maintain his good reputation, and would allow him to mediate the interpretive disagreement. Randazza Dec. ¶ 3. Kahn and Randazza spoke again on July 5, 2012, and Kahn said that he agreed with Lieberman's interpretation. Randazza Dec. ¶ 4. Randazza then told him (paraphrasing) "very well, based upon your word, we will agree to that interpretation." At no point did Kahn say that he disagreed that there was a settlement in place. In fact, the content of the two calls made it clear that he, too, believed the matter to be settled. He even raised the issue of a motion to enforce settlement, stating that it was unclear to him how the Court would respond to a motion to enforce the settlement <u>as interpreted to exclude Bochenko.</u> Randazza Dec. ¶ 6. Then, once Kahn and Randazza resolved the debate, Randazza confirmed this accord by text message to Lieberman, so that he would not be left out of the loop. Randazza Dec. ¶ 7; ECF 41-2 at Exhibit B-3. At that point, any dispute over this provision, whether material or not, was no longer an issue. Nevertheless, the Defendant's attorneys then abruptly ceased all communications and began acting tempestuously, trying to unnecessarily prolong the litigation.

"Settlement agreements are designed to, and usually do, end litigation, not create it." *In re City Equities Anaheim*, 22 F.3d 954, 957 (9th Cir. 1994). An agreement has been reached by the Parties that should end this litigation, not drive the Parties to participate in additional costly and wasteful motion practice before this Court. The Defendant now seeks to avoid the agreement entirely, even after Plaintiff's concession as to Oron's counsel's interpretation of the terms, and even after the Plaintiff began performing. Oron's position lacks any logical or legal support.

When reviewing a contract, "the Court must give preference to reasonable interpretations as opposed to those that are unreasonable." *Turner v. U.S. ex rel. U.S. Dep't of Agric., FMHA*, 875 F. Supp. 1430, 1434 (D. Nev. 1995), citing *Kennewick Irrigation Dist. v U.S.,* 880 F.2d 1018, 1032 (9th Cir. 1989). A reasonable interpretation of the agreement would be that it is between Liberty and Oron only. However, even despite the fact that the Defendant's interpretation could be seen as unreasonable, the Plaintiff conceded to the Defendant's interpretation and moved on. Thus, the reasonable interpretation analysis now shifts to whether the settlement document clearly manifests an intent to settle. Whatever ambiguity might have hypothetically existed was temporary, and ultimately resolved to accommodate the Defendant's position. Any ambiguity and any question of

fact was resolved by the Plaintiff's reluctant concession to interpret it the same way the Defendant claimed it should be interpreted. See ECF 41-2 at Exhibit B-3. Accordingly, at this point, nobody can disagree as to the terms of the settlement. They are clear, written, and signed. If there are ambiguities requiring resolution, the Defendant has not raised them in its opposition and should not be permitted to manufacture new ones at this point.

**B. Plaintiff Performed Under the Settlement**

As the record reflects, the Plaintiff not only agreed to the Defendant's proposed settlement terms, but began complying with them. ECF 33-2. And this compliance was clearly of great importance to the Defendant. The Defendant has made quite a display of the fact that it was concerned that its web hosting company, Leaseweb B.V., would shut down its operation for non-payment if the Court did not release what seemed to be ludicrous amounts of money to it. ECF 15 at 4 ("Plaintiff is seeking relief that will effectively put Oron out of business."); ECF 20 at 1 ("Without use of those servers … Oron will not be able to continue its business."); ECF 24 at 3 ("If Oron cannot pay its third party service provider, all its business will come to a halt."). Given the amount of ink that the Defendant has spilled in trying to convince this Court that Leaseweb would shut them down for non-payment, it seems quite evident that assurances being sent to Leaseweb were quite important to the Defendant. This importance manifests itself in a term that the Defendant insisted upon in the settlement agreement – that the Plaintiff inform Leaseweb of the fact that the dispute was settled. ECF 44-2 ¶ 14.

Given that the matter was settled, the Plaintiff immediately complied, sending a letter to Leaseweb and copying defense counsel. ECF 33-2. Defendant's counsel never complained about the content of the letter. Given that Oron is still operating today, despite the fact that it seems to have not managed to get a hold of the €348,845.29 (approximately $422,974.90 USD) that they sought from this Court on two occasions, and from the Hong Kong court on one, it seems that not only did the Plaintiff perform, but Oron received a very valuable benefit from that performance. ECF 25-1.

While Plaintiff is not in the possession of a firm confirmation of why Oron has not yet "ceased to exist as a going concern," if the Court examines the evidence in the record, it would

seem that the Plaintiff's performance of this obligation under the settlement agreement was the only thing that allowed Oron to continue operating. Accordingly, one must ask whether the settlement agreement was a ruse to achieve this goal or whether there is some other explanation for Oron's current position.[6]

**C. Whether the Defendant Calls Agreement a "Term Letter" or "Settlement Agreement" is Irrelevant**

You can call a dog a chicken, but that won't make it lay eggs. The Defendant seems to want to call the settlement agreement a "term letter" as if this changes its legal effect. It does not. The fact is that all of the evidence in the record demonstrates that a settlement was reached. The Defendant sent the agreement in writing. ECF 44-2. All Parties agreed to the terms. The Plaintiff signed it. The Plaintiff performed. ECF 33-2. The only issue that the Parties ever disagreed upon was whether or not the settlement should also benefit Bochenko, a party who was not part of the negotiations and who claims to have absolutely no connection to FF Magnat. ECF 21-1. A party who has "settlement remorse" cannot repudiate the settlement by manufacturing a dispute over what seems to be an irrelevant issue. Furthermore, the key points of the settlement are quite clear and manifested in writing with signatures. This shows that the Parties agreed on the material terms and manifested an intent to be bound by the terms. See *Kohn v. Jaymar-Ruby, Inc.*, 23 Cal. App. 4th 1530, 28 Cal. Rptr. 2d 780 (Ct. App. 1994) (substantial evidence of a binding settlement where settlement conference minutes noted settlement was reached, terms of settlement were confirmed by letter, and appellant did not claim that the terms were inaccurate). The fact is, if the Plaintiff wanted to repudiate the settlement agreement, it could not come forward with an irrational interpretation of other portions of the agreement to do so. Furthermore, even the Defendant's actions substantiate the view that all parties believed that the matter was settled. ECF 28; ECF 41-2 at Exhibit B-3; ECF 44-4 at 2; ECF 44-5 at 2 (Mr. Lieberman writing, "That is what is

---

[6] It cannot go without saying that the tenor of the opposition to the Motion to Enforce Settlement and the tenor of other documents filed by the Defendants to date, suggest that the Defendant's counsel is taking this all rather personally. Accordingly, the suspicion must be brought to light that this is an effort by defense counsel to prolong this litigation in violation of 28 U.S.C. § 1927.

contemplated by the letter confirming the agreement."). If the sole issue that the Defendant claims was in dispute is the question of whether the agreement benefits Maxim Bochenko, then the settlement agreement is clearly a manifestation of a serious degree of agreement between the Parties. It should be enforced, especially given the Plaintiff's acquiescence to the Defendant's interpretation.

## IV. CONCLUSION

The settlement (ECF 44-2) is clearly a valid settlement agreement. The Defendant put the terms in writing and insisted upon a signature if Plaintiff agreed to the terms.[7] The Plaintiff signed. The Plaintiff commenced performance of its obligations under the settlement agreement. ECF 33 at 3; ECF 33-2. The Defendant benefited from that performance. The Parties then disagreed about the interpretation of one term (and the Plaintiff suspects that disagreement to be artificially manufactured). In the interest of settlement, the Plaintiff then conceded to the Defendant's position. Nothing in the agreement was ever "repudiated," and the Defendant's attempt to manufacture a repudiation should be seen for what it is: rubbish.

There are three possible outcomes to the motion:

1) The settlement agreement, as written, does not include Maxim Bochenko, and the Court should then enforce it as it relates to Liberty and Oron only;
2) The settlement agreement, as written, does include Maxim Bochenko, and the Court should then enforce it accordingly; or
3) The settlement agreement, as written, does not include Maxim Bochenko, but Liberty's later concession of this point is binding upon Liberty, and thus, the Court should enforce it accordingly.

Rather that continue to burden both the Parties and the Court with the expense of unnecessary litigation and motion practice, this case should be recognized for what it is: a settled case with a Defendant reluctant to continue forward with settlement on the terms they agreed to, even after enjoying the benefits of the Plaintiff's partial performance. Accordingly, the Defendant

[7] If there was not a settlement agreement, then what purpose did the insistence upon a signature serve?

should be Ordered by the Court to adhere to the agreement, and fees should be taxed to the Defendant for its unreasonable refusal to adhere to its own settlement agreement.

Dated: July 23, 2012

Respectfully Submitted,

*s/Marc J. Randazza*

Marc J. Randazza, Esq., NV Bar # 12265
Ronald D. Green, NV Bar # 7360
J. Malcolm DeVoy, NV Bar #11950
Randazza Legal Group
6525 W. Warm Springs Rd., Ste. 100
Las Vegas, NV 89118
888-667-1113
305-437-7662 (fax)
rlgall@randazza.com

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing document was filed using this Court's CM/ECF system on July 23, 2012.

Dated: July 23, 2012

Respectfully Submitted,

*s/Marc J. Randazza*

Marc J. Randazza, Esq., NV Bar # 12265
Ronald D. Green, NV Bar # 7360
J. Malcolm DeVoy, NV Bar #11950
Randazza Legal Group
6525 W. Warm Springs Rd., Ste. 100
Las Vegas, NV 89118
888-667-1113
305-437-7662 (fax)
rlgall@randazza.com